CAROLYN C. ROBERSON, Administratrix of the Estate of William Alton Roberson, Jr. v. J. R. GRIFFETH and CITY OF BURLINGTON

No. 8115SC918

(Filed 18 May 1982)

Negligence §§ 1.3, 29.1— accident resulting from high speed police pursuit—summary judgment improperly granted

In a negligence action in which plaintiff's intestate, a police officer for the City of Graham, was killed while on duty when he was struck by a car being pursued by an officer of the City of Burlington Police Department, the trial court erred in granting summary judgment for defendants, the City of Burlington and the Burlington officer, where plaintiff offered a forecast of evidence which questioned (1) the Burlington Police Department's training of its officers in the tactics and techniques and decision making process of high speed police pursuit chases and (2) the police officer's decision to pursue a suspected violator of a misdemeanor law rather than following a warrant arrest procedure.

APPEAL by plaintiff from McLelland, Judge. Judgment entered 17 April 1981 in Superior Court, ALAMANCE County. Heard in the Court of Appeals 8 April 1982.

This action arises out of an automobile collision which occurred when a vehicle driven by Terry Lee McGee at an estimated speed in excess of 100 miles per hour struck head on an

automobile driven by plaintiff's decedent, William Alton Roberson, Jr. At the time of the collision, the McGee vehicle was the object of a high speed pursuit conducted by Officer J. R. Griffeth of the police department of the city of Burlington for a misdemeanor traffic violation.

Plaintiff's intestate Roberson, was a police officer for the city of Graham which adjoins Burlington. Roberson was on duty, driving a Graham police vehicle, when he was struck by the McGee vehicle on Hanover Road in Graham.

The Roberson car had been parked at a car dealership within the Haw River city limits where Roberson and Sergeant Conklin of the Burlington Police Department were conversing through their open driver's side windows. Conklin's radio broadcast the message from Griffeth that he was in pursuit of the McGee vehicle on Hanover Road proceeding toward Sellars Mill Road. Roberson immediately pulled out of the car dealership and proceeded onto Hanover Road in the direction of the chase. Roberson turned on his blue light and was complying with the speed limit. He could not hear any further transmissions from the Burlington Police Department without flipping a switch on his radio which would have allowed him to monitor the Burlington Police frequency instead of his own Graham Police frequency.

The plaintiff alleged negligence on the part of both defendants. From the granting of defendants' motion for summary judgment, plaintiff appealed. Other facts pertinent to the resolution of this appeal are contained in the opinion of the Court.

*Hemric, Hemric & Elder by H. Clay Hemric, Jr., for the plaintiff-appellant.*

*Smith, Moore, Smith, Schell & Hunter by Robert A. Wicker and Peter J. Covington, for the defendant-appellees.*

MARTIN (Robert M.), Judge.

A party moving for summary judgment has the burden of " 'clearly establishing the lack of any triable issue of fact by the record properly before the court. His papers are carefully scrutinized; and those of the opposing party are on the whole indulgently regarded.' 6 Pt. 2 Moore's Federal Practice, § 56.15[8],

at 642 (2d ed. 1976);" *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 469-70, 251 S.E. 2d 419, 421 (1979). The language of Rule 56, N.C. Rules Civ. Proc., conditions the rendition of summary judgment upon a showing by the movant that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The court is not authorized by Rule 56 to decide an issue of fact. It is authorized to determine whether a genuine issue of fact exists. "The purpose of summary judgment is to eliminate formal trials where only questions of law are involved by permitting penetration of an unfounded claim or defense in advance of trial and allowing summary judgment for either party when a fatal weakness in the claim or defense is exposed." *Moore v. Fieldcrest Mills, Inc., supra* at 470, 251 S.E. 2d 422; *Caldwell v. Deese*, 288 N.C. 375, 218 S.E. 2d 379 (1975). *Moore v. Fieldcrest Mills, Inc.,* supra at 470, 251 S.E. 2d 422, continues its analysis of summary judgment stating:

> "The device used is one whereby a party may in effect force his opponent to produce a forecast of evidence which he has available for presentation at trial to support his claim or defense. A party forces his opponent to give this forecast by moving for summary judgment. Moving involves giving a forecast of his own which is sufficient, if considered alone, to compel a verdict or finding in his favor on the claim or defense. In order to compel the opponent's forecast, the movant's forecast, considered alone, must be such as to establish his right to judgment as a matter of law." 2 McIntosh, N.C. Practice and Procedure, § 1660.5 (2d ed. Phillips Supp. 1970). "If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied. . . ." 3 Barron and Holtzoff, Federal Practice and Procedure, § 1234 (Wright ed. 1958).

We now determine the propriety of summary judgment for defendants in this case by applying these legal principles to the record properly before us.

Was plaintiff's intestate killed because of the negligence of either of the defendants? This is the overriding issue of fact which plaintiff must establish at trial in order to prevail on her cause of action. Plaintiff asserts that the Burlington Police Department failed to adequately train Officer J. R. Griffeth in the

proper techniques and decision-making processes of high speed police pursuit and the alternative uses of the warrant arrest procedure in lieu of high-speed pursuit. She further asserts that the conduct of Officer Griffeth while pursuing a suspect created an unreasonable risk of harm to plaintiff's decedent, Roberson. To support their motions for summary judgment and establish the non-existence of negligence on the part of either defendant, movants offered the affidavits and depositions of Raymond F. Shelton, James Elbie Conklin and James Robert Griffeth.

Defendant James Griffeth gave the following affidavit concerning the pursuit of the McGee vehicle:

At approximately 1:50 a.m. on the morning of July 12, 1978, I was on patrol duty in the City of Burlington in the vicinity of the intersection of Graham-Hopedale Road and Hanover Road. While stopped at this intersection facing north on Graham-Hopedale Road, Officer M. O. Wall of the Burlington Police Department communicated by radio the direction of travel of a vehicle which he stated had been driving left of center and had almost run him off of Hanover Road. Both Officer Wall and the vehicle were within my sight heading east on Hanover Road towards my position at the intersection of Hanover Road and Graham-Hopedale Road. The vehicle passed directly in front of my patrol car and I was able to identify that the driver was Terry Lee McGee. I personally knew that Terry Lee McGee had had his driver's license revoked and had a very serious and extensive negligent driving record. I had apprehended him while he was driving the same vehicle approximately a week earlier for driving while his license was revoked and possession of marijuana. When the vehicle passed in front of my patrol car, I recognized Terry Lee McGee and his vehicle. The weather was clear, visibility was good, the road was dry, and, since it was an early weekday morning, there was no other traffic on Hanover Road.

Once Terry Lee McGee's vehicle passed my patrol car heading east on Hanover Road and I made a visual identification, I turned right from my position facing north at the intersection of Graham-Hopedale Road and Hanover. I turned on my high beams and the blue revolving lights on top of my

patrol car. Once my blue lights were turned on, Terry Lee
McGee increased his speed to 50 m.p.h. or more. When he in-
creased the speed of his vehicle, I turned on my police siren;
but Terry Lee McGee rapidly accelerated his vehicle. Both
his vehicle and my patrol car were then heading east on
Hanover Road. At the beginning of my pursuit, I had radioed
police headquarters in Burlington that I was in pursuit of a
vehicle on Hanover Road heading east towards Graham,
North Carolina.

The pursuit proceeded east on Hanover Road through
the intersection of Hanover Road and Sellars Mill Road and
in the direction of the city limits of Graham. As the McGee
vehicle approached the intersection of Hanover and Sellars
Mill Road, the stop light was red. Terry Lee McGee,
however, proceeded through the red light at the intersection.
After crossing the intersection of Hanover and Sellars Mill
Road, I radioed Burlington Police headquarters of my posi-
tion and my continued pursuit of Terry Lee McGee. I again
reported my location to the Burlington Police headquarters
when my vehicle passed the back entrance to Cummings
High School on Hanover Road. I estimated that the speed of
the fleeing McGee vehicle at that point was in excess of 100
m.p.h.

Because of the speed of the McGee vehicle, it began to
pull away from me once we passed the back entrance to Cum-
mings High School on Hanover Road. At this time I discon-
tinued the pursuit because the McGee vehicle was going too
fast and I was aware that we were heading in the direction
of, and soon would enter, a series of very sharp curves in the
road and that I would not be able to overtake him or
negotiate these curves. I lost sight of Terry Lee McGee's
vehicle as I was breaking off the pursuit and as his vehicle
entered the first curve still heading east on Hanover Road.
Shortly after McGee's vehicle disappeared around the curve
on Hanover Road, and while slowing down, I heard the voice
of Corporal James Conklin of the Burlington City Police
Department over the radio say that there had been a wreck
in the curve. I drove to the scene and saw that Terry Lee
McGee's vehicle had collided head-on with a City of Graham

patrol car. I did not know until I got out at the scene of the accident who was driving the City of Graham car.

At all times during my pursuit of the vehicle being driven by Terry Lee McGee, the emergency blue flashing lights and the siren on my police car were operating. I would estimate that I attained a top speed of approximately 80-85 m.p.h. in the pursuit, which I maintained for approximately 10-15 seconds. My entire pursuit of the McGee vehicle occurred on Hanover Road for approximately two miles from start to finish, and lasted approximately three minutes.

I did not see or meet any other traffic on Hanover Road during the pursuit. While I made several radio communications to the Burlington Police Department headquarters, at no time was I aware that Graham Police Officer William Alton Roberson, Jr. was proceeding towards the pursuit by driving his police vehicle in a westerly direction on Hanover Road towards the direction from which Terry Lee McGee's vehicle was heading. At the time of the collision between Officer Roberson's car and the vehicle driven by Terry Lee McGee occurred, I had disengaged the pursuit of the McGee vehicle and was no longer in visual contact with that vehicle.

Griffeth also testified by deposition in pertinent part as follows:

I do not recall who taught me the theories and procedures of pursuit driving in the classroom. In Police School Captain Long taught drugs, vice, prostitution, gambling and patrol operations, and that is all I recall of that.

As to pursuit driving, I do not recall who taught it or how much time was devoted to it. I do recall reading the portion of the manual on pursuit driving. I have not reread the pursuit procedures manual and my present knowledge of the pursuit manual is based on my reading of it when in training. . . . The practical training I received from the Burlington Police Department on pursuit driving when I was an auxiliary officer occurred during my field training in March when pursuit driving was taught. . . . The training I received from Officer Jordan was a training session in two actual pursuits, in which I was driving.

To the best of my knowledge, at the time of this incident on the 12th of July, 1978, there was no set violation as to when a car should be pursued. If a violation occurred in my presence, and the officer thought that the pursuit could be handled in a safe manner for himself and others, he could pursue that vehicle. And as far as the speed goes, I don't believe there was a set speed, saying that a police officer should go no faster than a certain speed. I don't believe there is a statement like that in the pursuit policy of the Burlington Police Department.

I am not familiar anymore with the procedure on pursuit driving of the training manual of the Burlington police officers. I don't think any segregation was ever created in pursuing a felony suspect such as rape or murder from pursuing a speeding misdemeanant or a driving while license revoked misdemeanant. The control of the chase was given to the line supervisor at that time, depending on the circumstances surrounding the pursuit.

The line supervisor could be the lieutenant on duty, the sergeant on duty, the first sergeant, or the corporal on duty — whichever was the ranking officer at the time of the pursuit. He could call, as far as radio communications, wanting to know the type of violation that you had. That would be just about all he'd ask. He had authority to terminate the pursuit.

That would be during the first stages of the pursuit. During this particular pursuit, I did call and notify my line supervisor of what the person I was chasing was suspected of. I suspected this person of driving-while-license-revoked. The line supervisor that I notified was Bill Fox. I notified Headquarters; I didn't call a specific car. No one told me to go ahead with the pursuit.

You did not have to receive permission to go ahead with the pursuit. The line supervisor could terminate the pursuit.

Sergeant James Conklin of the Burlington Police Department stated in his affidavit that he was talking with Roberson in the parking lot of a Haw River car dealership when Griffeth's message about the McGee chase came over his radio. Roberson

immediately left the parking lot and proceeded toward the chase, followed by Conklin. Both had on their blue lights and Conklin estimated Roberson's speed to be between 45-55 m.p.h. in a 45 m.p.h. zone. Conklin lost sight of the Roberson vehicle in a curve, heard the collision and then arrived upon the accident scene. Conklin, unaware of any termination of the chase by Griffeth, radioed to him about the accident and he arrived at the scene shortly thereafter.

Sergeant Conklin further testified by deposition in pertinent part as follows:

> As to whose responsibility it is to determine if a suspect should be chased and when the chase should be terminated, No. 1, the officer involved. He can break it off at any point that he feels that it's unsafe.
>
> A lot of things are taken into consideration; the time of day for one thing. Traffic conditions, heavy congested traffic. Charges, nature of charges. As to what factor the nature of the charges play in the decision to chase or terminate the chase, whether or not the seriousness of the charge plays any factor, as to whether or not it's a felony, a rape, murder or bank robbery, yes, but it depends on the situation. It's hard to say in black and white.
>
> As to what I meant by my prior answer stating that the seriousness of the crime is a factor in the decision to chase or terminate the chase, certainly, if it's a felony you would pursue. In a misdemeanor, traffic charges you pursue. But, if it gets to the point where it becomes too dangerous, you break it off. Or, you go outside the city, and you break it off. Considering all the factors such as time of day, traffic conditions and whether or not the suspect was a felon or a low-grade misdemeanant, I would think you would chase a felon more readily than you would a misdemeanant. But we're going to chase, regardless. If you make a positive identification of the suspect and you know the suspect before the chase begins and if you see the violation of the law before the chase begins you can utilize the warrant procedure to go arrest the person.
>
> As to whether it makes a difference whether you're chasing him for a misdemeanor or a felony, I would, as a

supervisor, if it were a felon, I would let my men go outside the City of Burlington and pursue a felon, more readily than I would a misdemeanant.

　　As to whether I would allow my men to pursue a suspect who was driving with a revoked license, a misdemeanor, and who had been positively identified and had been arrested before, and as to whether I would allow my men to pursue him at speeds of 80 or 85 miles an hour on city streets at any time of day or night, I would take into consideration, first, the time of day, the traffic conditions — heavy traffic, at 4:00 in the afternoon, with school out and Church Street traffic bumper to bumper, no, I wouldn't.

　　If an officer had made a positive identification of a man for a crime of driving while license revoked, and it were nonexistent traffic, and it were 1:50 in the morning, as to whether I would authorize an 80 to 85 miles an hour chase by an officer to apprehend a man that an officer had made a positive identification on, first of all, we don't set the pace on a chase; the car that we're chasing does. He can go 200 miles an hour. If the officer pursued, I would allow him to go. And then, if the officer decided it was too dangerous, he could cut it off. Or if I decided it was becoming too dangerous, I would cut it off. I would tell him to cut it off.

　　As to the amount of time that I would have to terminate a chase at 80 or 85 miles an hour, it would be a much shorter period of time than it would at 40 or 55.

Police Chief Raymond Shelton of the Burlington Police Department gave the following testimony in his deposition:

　　As to whether or not I am familiar with the fact that the pursuit driving section of the Burlington Police Officers' Training Manual does not provide as to the priority of chasing, whether chasing felons, low grade misdemeanants or status violators, the manual addresses all of those. I think that the manual sets priority on safety, when, and when not to pursue and not so much for the offense. The nature of the offense suspected does play a factor. Regardless of how serious an offense it was, if it was too dangerous to pursue, they'd be obligated to cease; even if it was a major offense, they'd be obligated to desist chasing the person.

As to whether or not somewhere in the pursuit procedure the difference between pursuing a serious misdemeanant or a low-grade misdemeanant or a serious felon — as in rape, murder or bank robbery — is explained to a patrolman, this policy puts a burden on the officer to stop, depending on the danger involved regardless of how minor or how serious an offense it is. The policy does not provide anywhere as to whether or not a pursuit should commence based on the severity of the crime the suspect is suspected of having committed. It's not one thing that governs whether he will or will not pursue. The officer has many factors to take into consideration.

Regardless of the time of day or night I would always classify a chase at 80 or 85 miles an hour in a 45 zone as a high speed chase.

As to the process involved in initiating the decision to chase a violator, the first responsibility is on the officer to make sure that he can chase and chase safely. The line supervisor can also terminate the chase, if he thinks the time of day is not appropriate. The line supervisor becomes aware of a chase because the officer calls it in to headquarters. Headquarters logs it out and all the other cars are monitored. The line supervisor works anywhere in the police department. He usually monitors traffic all the time. He has a portable radio he carries with him as well as one in his car, or if he's in the office there's a radio there. As to whether he is supposed to call and tell the officer to continue the chase, he doesn't call to tell him to continue; if he thinks it's too dangerous, he calls him and tells him to discontinue. Officers do not call in for permission to chase.

There is no policy in the Burlington Police Department for reviewing chases unless an accident occurs. If an accident occurs, then we have an Accident Review Board that hears all accidents that officers are involved in. I am speaking of an accident in which an officer is involved. If an officer is chasing a suspect, and if the suspect is killed that is not an accident involving a police officer. There is no review procedure if the suspect is killed.

When the affidavits and depositions offered by defendants in support of their motion for summary judgment are viewed in the

light most favorable to plaintiff, the evidentiary forecast is such that this evidence alone does not establish defendants' right to judgment as a matter of law. These depositions do not establish a lack of negligence on the part of either defendant. *Moore v. Fieldcrest, supra.* Furthermore, plaintiff offered a forecast of her evidence consisting of the affidavit of Richard Hathaway Turner, the founder and chairman of the Board of The National Academy of Police Driving, who stated as follows:

> Based upon the affiant's personal knowledge gathered from reading the materials in this case including the depositions hereinbore [sic] mentioned, the affiant has an opinion satisfactory to himself that the training employed by the Burlington, N.C. police dept in training officer J. R. Griffeth and other officers similarly situated in time in the tactics and techniques and decision making process of high speed police pursuit chases and the use of police pursuit was inadequate to protect the safety of the members of the general motoring public in that it failed to differentiate between the chasing of suspects who had committed crimes of different grades, such as felonies and misdemeanors and between low-grade misdemeanors and high grade misdemeanors. The training also failed to give officers such as Griffeth guidance as to when the warrant arrest procedure should be used instead of high speed chases, especially when the officer had made a complete identification of the suspect and knew where to arrest the suspect at a later time.
>
> . . .
>
> Affiant is further of the opinion that the conduct of J. R. Griffeth acting as an agent and employee of the Burlington, N.C. Police Dept. as a sworn police officer was improper police conduct and showed a reckless disregard for the rights of the motoring public in the Burlington, N.C. area when Griffeth pursued a fleeing suspect whom he suspected of violating the "driving while license revoked" laws and no others except for a violation of a red light statute after the chase began. Affiant says that the complete recognition of the suspect by Griffeth before the chase ensued which resulted in speeds of 84 mph for almost 5000 feet was totally improper police conduct and showed a reckless disregard for

the safety of others, notwithstanding that the officer was pursuing a suspected violator of the misdemeanor laws of the state of North Carolina. That Officer Griffeth was negligent in pursuing this suspect in this fashion, considering all of the circumstances and the police dept. of Burlington, N.C. was negligent in allowing officers such as Griffeth to drive police vehicles in such chases when they had not received proper training in pursuit driving and pursuit decision making.

As a general proposition, issues of negligence are ordinarily not susceptible of summary adjudication either for or against the claimant "but should be resolved by trial in the ordinary manner." 6 Pt. 2 Moore's Federal Practice, § 56.17 [42] at 946 (2d ed 1976); *Moore v. Fieldcrest Mills, Inc., supra.* It is only in the exceptional negligence case that summary judgment should be invoked. Even when there is no substantial dispute as to what occurred, it usually remains for the jury to apply the standard of the reasonably prudent man to the facts of the case. 11 Strong's N.C Index 3d, Rules of Civil Procedure § 56.6 (1978); *Caldwell v. Deese*, 288 N.C. 375, 218 S.E. 2d 379 (1975).

Our Supreme Court has recognized that the actions of a police officer are subject to the scrutiny of a jury in applying the reasonably prudent man standard when sufficient allegations of negligence are made. In *Goddard v. Williams*, 251 N.C. 128, 133-34, 110 S.E. 2d 820, 824-25 (1959) the court adopted the following language:

"We do not hold that an officer, when in pursuit of a lawbreaker, is under no obligation to exercise a reasonable degree of care to avoid injury to others who may be on the public roads and streets. What we do hold is that, when so engaged, he is not to be deemed negligent merely because he fails to observe the requirements of the Motor Vehicles Act. His conduct is to be examined and tested by another standard. He is required to observe the care which a reasonably prudent man would exercise in the discharge of official duties of a like nature under like circumstances." . . . "We know of no better standard by which to determine a claim of negligence on the part of a police officer than by comparing his conduct *   *   * to the care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances." (Citations omitted.)

In this case it is for the jury to decide whether the defendants were negligent.

The defendants also assert that their negligence was not the proximate cause of Officer Roberson's death due to the intervening negligence of the suspect McGee. We agree with plaintiff that the question of proximate cause is a question for the jury. *Nance v. Parks*, 266 N.C. 206, 146 S.E. 2d 24 (1966); *Moore v. Beard-Laney, Inc.*, 263 N.C. 601, 139 S.E. 2d 879 (1965). We likewise reject defendants' assertion that Officer Roberson was a borrowed servant of the City of Burlington.

For the foregoing reasons the judgment of the trial court is

Reversed.

Judges VAUGHN and ARNOLD concur.